UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **GLYNN E. DAVIS** | **CIVIL ACTION NO. 05-0121** |
| **VERSUS** | **JUDGE ROBERT G. JAMES** |
| **GUARDIAN LIFE INSURANCE CO. OF AMERICA, ET AL.** | **MAG. JUDGE JAMES D. KIRK** |

RULING

This cases arises from a dispute regarding Third-Party Defendant The Guardian Life Insurance Company of America's ("Guardian") denial of Plaintiff Glynn E. Davis' ("Davis") claim for short-term disability benefits. Davis, a member of United Steelworkers of America Local 13-064 ("Local"), was a participant in a group disability benefits plan (" Plan") issued to the Local. Davis claims that United Steelworkers of America ("USA"); the Local; and Stanley Green ("Green"), the Local's President (collectively referred to as "Third-Party Plaintiffs"), breached their fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. (" ERISA").

Pending before the Court is a Motion for Summary Judgment [Doc. No. 89] filed by Third-Party Plaintiffs claiming inter alia that the Plan does not qualify as an "employee welfare benefit plan" under ERISA and, therefore, the Court lacks subject matter jurisdiction over Davis' claims. Davis joins Third-Party Plaintiffs' claim [Doc. Nos. 129 & 142]. Guardian opposes the Motion for Summary Judgment and contends that the Plan is subject to ERISA [Doc. Nos. 128, 138, & 139].

Also pending before the Court are cross-motions for summary judgment filed by Third-

Party Defendants P&S Benefit Consultants, Inc. ("P&S") [Doc. No. 78] and Guardian [Doc. No. 79] on Third-Party Plaintiffs' claims for fraudulent misrepresentation and breach of fiduciary duty.

For the following reasons, the Motion for Summary Judgment filed by Third-Party Plaintiffs regarding whether the Plan is subject to ERISA is GRANTED, and this case is REMANDED to the Fourth Judicial District Court, State of Louisiana, Parish of Ouachita. The cross-motions for summary judgment are DENIED AS MOOT.

I.   FACTS AND PROCEDURAL HISTORY

The Local represents employees of Graphic Packaging International, Inc. in West Monroe, Louisiana. In 2002, the Local formed an insurance committee to solicit proposals for a supplemental disability benefits plan which would guarantee coverage to all its participating members.

On or about April 4, 2002, Henry Statham and Troy Pardue ("Pardue"), brokers at P&S, a local insurance agency, submitted a proposal from Guardian.

The insurance committee selected the Guardian proposal to offer to its members. At the next meeting of the Local members, a motion was made to retain Boston Mutual Insurance Company, their current provider, but to also offer the Guardian Plan. A vote was held, and the motion was accepted.

Following membership approval of the Guardian proposal, the Local executed an Enrollment Success Plan ("ESP") with Guardian. The ESP required the Local to meet several conditions in exchange for Guardian agreeing to waive its minimum participation requirements. In accordance with the ESP, the Local provided Guardian with a census of its members and made

the union hall available for enrollment.

On or about May 30, 2002, the Local completed an application for a Non-Medical Plan of Group Insurance ("Application"). The Application designates the Local as the Policyholder and Green, the Local's President, as the Plan Correspondent. After Guardian approved the Application, a Plan was issued to the Local with an effective date of July 1, 2001, and fixed premium rates for two (2) years.

After the Plan was issued, Guardian provided the Local with the written policy of the Plan ("Policy"). The Policy refers to the Local by name in defining the eligible class of participants and as the entity which purchased the Plan.

As Policyholder, the Local was ultimately responsible for submitting the entire premium payment to Guardian. To facilitate this process, individual participants completed a bank-draft form which authorized deductions from their paychecks to be forwarded to Forest Kraft Federal Credit Union, which then submitted one payment to Guardian.

Guardian also provided participating members with a "booklet,"[1] which summarized the Policy. The booklet's cover sheet includes Guardian's name and logo at the top and "PACE LOUISIANA LOCAL 4-0364"[2] at the bottom. [Doc. No. 128, Exh. B, Plan 0079].[3] In the "Claims Procedure" section, participants are instructed to obtain claims forms from the "Plan

---

[1]The term "booklet" is shorthand for the Summary Plan Description ("SDP"), an ERISA disclosure document containing certain minimum information and distributed to all eligible employees. See 29 U.S.C. §§ 1022, 1024.

[2]The Local was formerly affiliated with the national union Paper Allied-Industrial Chemical and Energy Workers ("PACE") and was known as "PACE 4-0364." The Local is now affiliated with USA.

[3]The Court has followed the pagination of the Plan and booklet employed by Guardian.

Administrator." [Doc. No. 128, Exh. B, Plan, 00145].  In the short-term disability section, participants are provided with a toll-free number to contact Guardian and instructed to obtain a claims form from the plan sponsor, which is elsewhere defined as the union to which the plan is issued. [Doc. No. 128, Exh. B, Plan, 00112-113, 00123].  In the long-term disability section, participants are instructed to obtain a claims form from Guardian. [Doc. No. 128, Exh. B, Plan, 00126-127].  The booklet also states that the Plan is subject to ERISA and includes a "Statement of ERISA Rights." [Doc. No. 128, Exh. B, Plan, 00144].  Participants were also provided with an insurance card including Guardian's toll-free number. [Doc. No. 104, Exh. 8, p. 16, lines 5-17].

On or about September 24, 2002, Davis enrolled in the Plan and selected short-term and long-term disability coverage.

In May 2004, the Local met with P&S agents to discuss Guardian's premium increases prior to the expiration of the rates initially agreed to.  Following this meeting, Green created and distributed a flyer to members describing the premium increases and directing participants to contact him if they desired to change or terminate their payroll deductions.

Between June and August 2004, the Local failed to remit sufficient premium payments.

On or about August 21, 2004, Davis was diagnosed with a brain tumor.

On September 7, 2004, Guardian cancelled the Plan effective July 1, 2004.

Davis obtained a claims form from Green, and on September 15, 2004, Davis filed a claim with Guardian for short-term disability benefits.

On September 30, 2004, Guardian informed Davis that his claim was denied because the Plan had been cancelled.

On December 13, 2004, Davis sued Guardian in the Fourth Judicial District Court,  State

of Louisiana, Parish of Ouachita, to recover benefits under the Plan. [Doc. No. 1].

On January 20, 2005, Guardian removed the case to this Court asserting jurisdiction under ERISA. [Doc. No. 4].

On March 20, 2006, Davis voluntarily dismissed his claims against Guardian. [Doc. No. 42].

On April 3, 2006, Davis filed an amended complaint against Third-Party Plaintiffs for breach of their fiduciary duties under ERISA. [Doc. No. 43].

On June 22, 2006, Third-Party Plaintiffs filed an answer denying that the Plan was subject to ERISA and that the Court had subject matter jurisdiction. [Doc. No. 49]. Third-Party Plaintiffs also filed a third-party complaint against Guardian and P&S for fraudulent misrepresentation and breach of fiduciary duty. [Doc. No. 49].

On May 31, 2007, P&S filed a Motion for Summary Judgment [Doc. No. 78], and Guardian filed a Motion for Summary Judgment [Doc. No. 79] on Third-Party Plaintiffs' claims.

On June 4, 2007, Third-Party Plaintiffs filed a Motion for Summary Judgment [Doc. No. 89] claiming inter alia that the Plan was not subject to ERISA.

In response to the cross-motions for summary judgment [Doc. Nos. 78, 79, & 89], numerous opposition and reply briefs were filed. [Doc. Nos. 105; 104 & 126; 106 & 107, respectively].

On July 6, 2007, the Court ordered supplemental briefing regarding whether the Plan is subject to ERISA. [Doc. No. 116].

In response to the Court's order for supplemental briefing, numerous memoranda regarding the applicability of ERISA were filed by Third-Party Plaintiffs [Doc. Nos. 127, 132, &

5

133], Guardian [Doc. Nos. 128, 138, & 139], and Davis [Doc. Nos. 129 & 142].[4] P&S did not file a memorandum in response.

After extensive briefing, the Court is now prepared to rule on the pending motions for summary judgment.

## II.     LAW AND ANALYSIS

### A.     Summary Judgment Standard of Review

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id.

If the moving party can meet its initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache

---

[4]Guardian contends that it is disingenuous for Davis to claim that this is not an ERISA-plan after he stipulated that the Plan was governed by ERISA following removal [Doc. No. 29] and asserted that the Plan was subject to ERISA in his amended complaint [Doc. No. 43]. Third-Party Plaintiffs, not Davis, moved for summary judgment on this issue. See [Doc. No. 89-3, pp. 10-16]. Further, the Court has an ongoing duty to consider the foundation of its jurisdiction at every stage of the proceedings. See Mosley v. Cozby, 813 F.2d 659, 660 (5th Cir. 1987).

Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

      **B.**      **Employee Welfare Benefit Plan Under ERISA**

The parties dispute whether the Plan is subject to ERISA. ERISA applies to an "employee welfare benefit plan" established or maintained by an "employer" or "employee organization." See 29 U.S.C. §§ 1002(4), 1002(1); see also Meredith v. Time Ins. Co., 980 F.2d 352, 353 (5th Cir. 1993). Whether a plan qualifies as an "employee welfare benefit plan" is a question of fact. Hansen v. Continental Ins. Co., 940 F.2d 971, 976 (5th Cir. 1991) (citing Gahn v. Allstate Life Ins. Co., 926 F.2d 1449, 1451 (5th Cir. 1991)). This determination is governed by a three-part test which asks whether the plan (1) falls within the safe-harbor provision established by the Department of Labor; (2) exists; and (3) was established or maintained by an employee organization intending to benefit its members. See Meredith, 980 F.2d at 355. "If any part of the inquiry is answered in the negative, the submission is not an ERISA plan." Id.

The burden of showing whether a plan is subject to ERISA falls on the party asserting ERISA's application, or, in this case, Guardian. See Cooley v. Protective Life Insurance Company, 815 F. Supp. 189, 194 (S.D. Miss. 1993) (citing Murphy v. Inexco Oil Company, 611 F.2d 570, 574 (5th Cir. 1980)).[5]

---

[5]Guardian contends that it has already established that the Plan is subject to ERISA merely because this case has been proceeding under the Court's standing ERISA case order. [Doc. Nos. 79-2, p. 13, n. 36; 128, p. 4, n. 1]. However, the applicability of ERISA has not been established or even examined by the Court.

### 1. Safe-harbor Provision

The parties challenge the applicability of the third safe-harbor criterion only, which asks whether

> the sole functions of the . . . employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to. . . members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer.

29 C.F.R. § 2510.3-1(j)(3); see also Hansen, 940 F.2d at 977.

While this case presents a close question, the Court concludes that the Plan satisfies the third safe-harbor criterion. Guardian elevates form over substance by relying on the Local's contractual obligations and other purported endorsements to remove the Plan from the safe-harbor provision. However, as discussed below, the actual administration of the Plan shows that the Local's actions were limited to permissible activities under the third safe-harbor criterion.

Guardian contends that the Local endorsed the Plan and actively participated in the Plan's administration. Guardian argues that the Local endorsed the Plan by stating in a flyer used to advertise enrollment that "Guardian was selected by the Insurance Committee as the BEST Disability Policy." [Doc. No. 79, Exh. G]. Additionally, two members of the Local's insurance committee testified that they "endorsed" the Plan as required by the ESP.[6] Guardian also argues that the Local symbolically endorsed the Plan because the Guardian Plan was the only option available during enrollment and the Local representatives, including the Local's President, were

---

[6]Richard Loftin ("Loftin") and Charles Phillips ("Phillips") testified that "[w]e agreed to endorse the plan to the Union members that Guardian is [sic] presented," and "we. . . agree[d] to endorse the plan because that's the one we picked. . . ." [Doc. No. 128, Exh. 3, p. 54, lines 2-22; Exh. 5, p. 29, lines 19-20, respectively]. The ESP stated that "[w]e [the Local] agree to 'endorse' the plan to the Union Members." [Doc. No. 128, Exh. 7].

present throughout the enrollment process. Additionally, the booklet included the Local's name on the cover, instructed participants to obtain claims forms from the Local, and stated that the Plan was subject to ERISA.

In addition to endorsing the Plan, Guardian argues that the Local actively participated in the Plan's administration as the Plan's Sponsor, Administrator, and Correspondent.[7] For example, Davis testified that he obtained a claims form from Green, the Local's President, as directed by the booklet. See [Doc. No. 128, Exh. 9, p. 9, line 19]. In another example, the Local's representatives met with P&S agents to discuss premium increases, and Green created a flyer which he distributed to participating members.[8]

Third-Party Plaintiffs respond that the Local remained neutral toward the Plan and assumed no responsibility for the Plan's administration. Although the Local selected and purchased the Plan on behalf of its members, Third-Party Plaintiffs contend that the Local did not encourage enrollment merely by offering a second disability benefits provider to its members. The flyer advertising enrollment used Guardian letterhead, was prepared by P&S, and directed readers to contact P&S.[9] Further, the Local did not create the booklet, and the booklet did not

---

[7]Dani Winterhalter, a Guardian employee, averred that "[t]he Union served as the Plan Sponsor [and]. . . Administrator of the Plan." [Doc. No. 128, Exh. 2, ¶¶ 7-8].

[8]The flyer describes the rate increases and states:

> Please contact your group leader, Stanley Green of [the Local] to either change payroll deductions or stop deductions completely for group policy #36972. All changes should be made with the credit union prior to the first payroll in July.

[Doc. No. 128, Exh. 12].

[9]The flyer stated in pertinent part "[a]ny questions, call P&S Benefit Consultants. . . . We are a local Agency based here in West Monroe." [Doc. No. 79, Exh. G].

9

encourage members to enroll or otherwise advertise the Plan as part of the Local's overall benefits package.

Third-Party Plaintiffs also contend that the Local's role during the Plan's tenure did not comport with the written policy provisions. Insurance committee members testified that they believed the Plan was comprised of individual policies at a group rate and that P&S would assume responsibility for the Plan's administration.[10] Consistent with this understanding, participating members and a P&S broker testified that P&S was contacted to process claims or inquire about coverage issues.[11]

The primary inquiry under the third safe-harbor criterion is the employee organization's involvement in the Plan. See Hansen, 940 F.2d at 977 ("The only question is whether [the employer's] involvement in the program was sufficiently limited to meet the third of these requirements."). Since Hansen was decided, other courts have evaluated an employee organization's involvement by focusing on the participant's point of view. See Thompson v. American Home Assur. Co., 95 F.3d 429, 437 (6th Cir. 1996) ("[T]he relevant framework for determining if endorsement exists is to examine the employer's involvement in the creation or

---

[10]Billy Bob Hall, a member of the insurance committee, testified that P&S brokers said the Local was issued "[i]ndividual policies at a group rate." [Doc. No. 104, Exh. 5, p. 31, lines 6-8]. Loftin testified that P&S brokers "explained to us [that] they were solely responsible for handling communications of the plan and the problems that anybody had with it." [Doc. No. 104, Exh. 7, p. 112, lines 5-7].

[11]For example, Loftin testified that "[w]hen I had problems with the plan, I went to [a P&S agent]. . . . I didn't go through the Local. I didn't go through Stanley [Green]. I knew it was a waste of time and I was going to be sent out to [P&S's] office." [Doc. No. 104, Exh. 7, p. 112, lines 8-12]. Pardue, a P&S broker, testified in response to whether he contacted Green to deal with claims that, "[i]f someone needed help with starting a claim or had a claims issue or question, they came to our office [and] [w]e called The Guardian." [Doc. No. 104, Exh. 8, p. 16, lines 5-7].

administration of the policy from the employees' point of view.") (citing <u>Johnson v. Watts Regulator Co.</u>, 63 F.3d 1129, 1134, 1137 n.6 (1st Cir. 1995)); <u>see also</u> <u>Burgess v. Cigna Life Ins. Co.</u>, No. 04-0841, 2005 U.S. Dist. LEXIS 35256, at *9-10 (W.D. Tex. Dec. 22, 2005) (same).  A finding of endorsement is appropriate if a reasonable participant would conclude that the plan was endorsed and managed by the employee organization.

     Activities which demonstrate endorsement include serving as the plan's administrator; employing a full-time benefits administrator who accepts claims forms from participants and submits them to the insurer; providing participants with a booklet bearing the employee organization's logo, encouraging enrollment, or including a statement that the plan is governed by ERISA; or otherwise assuming responsibility for the administration of the plan.  <u>See</u> <u>Hansen</u>, 940 F.2d at 977 (finding endorsement where the employer employed a full-time employee benefits administrator); <u>Green v. Long Term Disability Plan for Emples. of Denny's</u>, No. 97-2250, 1998 U.S. Dist. LEXIS 1998, at *8-9 (E.D. La. Feb. 13, 1998) (finding endorsement where the booklet prominently displayed the employer's logo; expressly stated that the Plan was subject ERISA; listed the employer as the plan's administrator and sponsor; and instructed participants to submit claims to the employer's "Corporate Group Benefits Department."); <u>Burgess</u>, 2005 U.S. Dist. LEXIS 35256, at *9-10 (finding endorsement where the employer sent reminders to employees to review their options during annual and open enrollment periods).

     Conversely, an employee organization maintains its neutrality by limiting its involvement to facilitating payroll deductions; using a third-party to process claims, and avoiding the appearance of an endorsement in the booklet.  <u>See</u> <u>Dontas v. Metropolitan Life Ins. Co.</u>, No. 91-503, at *22-24 (E.D. La. Mar. 31, 1993), <u>aff'd</u>, 20 F.3d 1170 (5th Cir. 1994) (finding no

11

endorsement where the booklet stated that "[y]our employer is making available to employees, without endorsement, the opportunity to enroll. . . [The Plan] is not intended to be an employer-sponsored welfare benefit plan for purpose of [ERISA]."). Courts have also considered whether the terms of the written policy provisions are consistent with the employee organization's actual role during the Plan's tenure. See House v. Am. United Life Ins. Co., No. 02-1342, 2002 U.S. Dist. LEXIS 23396, at *60-61 (E.D. La. Dec. 3, 2002) (In order to rely on the written policy provisions, the proponent must show that the employee organization actually fulfilled its contractual obligations.).

   The Court finds that Guardian has failed to meet its burden of demonstrating that the Local's involvement would lead a reasonable participating member to conclude that the Local endorsed the Plan. The undisputed evidence shows that the Local's involvement in the Plan was related to permissible activities under the third-safe harbor criterion and that P&S acted as the Plan's administrator in practice. Further, the written policy documents do not contain any graphic or written endorsements that can be reasonably attributed to the Local.

   First, the Local's solicitation, selection, and purchase of the Plan on behalf its members does not remove the Plan from the safe-harbor provision. See Dontas, 1993 U.S. Dist. LEXIS 4443, at *20 (finding no endorsement where the employer negotiated the best terms for its employees under a group plan prior to the awarding of the insurance contract). Although Guardian was the only provider present during enrollment, Guardian ignores uncontroverted evidence that the Local's membership voted to offer the Guardian Plan in addition to retaining its

current provider.[12]

Guardian's argument that the Local explicitly endorsed the Plan is also unavailing. An objective reader of the flyer used to advertise enrollment would conclude that Guardian or P&S endorsed the Plan, not the Local. Although insurance committee members testified that they "endorsed" the Plan, the mere use of the word "endorse" as understood by a layperson does not compel the legal conclusion that the safe-harbor provision is inapplicable. "[A] a communication to employees indicating that an employer has arranged for a group or group-type insurance program. . . constitutes an endorsement. . . if, taken together with other employer activities, it leads employees to conclude that the program is one established or maintained by the communicator." Johnson, 63 F.3d at 1134 (citing Dep't of Labor Op. No. 94-26A (1994)) (emphasis added). As discussed below, the evidence shows that this was not a Local-managed or Local-established plan from the participant's perspective.

Second, Guardian cannot rely on the language and styling of the written policy documents to show endorsement. The booklet's cover sheet prominently displays Guardian's name and logo at the top. Although the Local's name is included, this is consistent with an identification of the Local as the Plan's policyholder. See Thompson, 95 F.3d at 437. The Local did not create or distribute the booklet, and the booklet does not encourage employees to enroll or advertise the Plan as part of the Local's benefits package. Cf. Hansen, 940 F.2d at 977; Green, 1998 U.S. Dist. LEXIS 1998, at *7-9; Magee v. Life Ins. Co. of N. Am., 261 F. Supp. 2d 738, 746 (S.D.

---

[12]Phillips testified that "[t]here was a motion made on the floor that we keep Boston Mutual and Guardian." [Doc. No. 104, Exh. 9, p. 36, lines 1-3]. Loftin testified that "the following Union meeting night is actually when they had the vote, and it turned out they decided to keep both of them; not just for the Union to endorse one company, but [for the] Union to agree to keep the two companies." [Doc. No. 143-9, Exh. 7, p. 118, lines 3-7].

Tex. 2003) (finding endorsement where the booklet stated "your employer is offering you the opportunity to purchase this insurance to make your benefit program more comprehensive and responsive to your needs").  The booklet states that the Plan is subject to ERISA, but Guardian has offered no evidence that the Local complied or attempted to comply with ERISA.  Cf. Burgess, 2005 U.S. Dist. LEXIS 35256, at *9-10 (finding an employer-managed plan where the employer treated the Plan as an ERISA plan and complied with all Department of Labor filing and reporting obligations).

   Third, the Court finds that the Local did not impermissibly participate in the Plan's administration.[13]  Davis' testimony that he obtained a claims form from the Local's President does not remove the Plan from the safe-harbor provision.  See Magee, 261 F. Supp. 2d at 744 (In a case finding endorsement, evidence that the employer made one phone call to the insurance company on the employee's behalf and told her it would forward a brochure from the insurance company was insufficient to show that the employer provided claims assistance.).  The evidence shows that P&S, not the Local, provided regular claims assistance during the Plan's tenure. Finally, Guardian has offered no contradictory evidence that participants actually considered the Plan to be managed by the Local.

   Guardian also argues that the Local played an active role in communicating pertinent information regarding the Plan to participants by distributing a flyer advising members of Guardian's premium increases and attendant payroll deductions.  However, these actions are

---

[13]The parties offered conflicting evidence as to whether the Local served as the Plan's Correspondent.  For example, Guardian offered evidence that correspondence was mailed to "Green," but Third-Party Plaintiffs offered evidence that correspondence was mailed to P&S' physical address.

directly related to permissible actions under the third safe-harbor criterion, which include obtaining a group rate for individual participants and facilitating payroll deductions.

Based on the foregoing evidence, it is clear that the Local's involvement in the Plan was limited to permissible activities under the third safe-harbor criterion and, from a reasonable participant's point of view, the Local did not endorse or manage the Plan.

Accordingly, the Court concludes that the Plan falls within the safe-harbor provision, and, therefore, is not subject to ERISA.[14]

### C. Subject Matter Jurisdiction

The case was removed to this Court on the basis of federal question jurisdiction. Because the Court finds that the Plan is not subject to ERISA, and there is no other federal question jurisdiction or diversity jurisdiction, the Court has no authority over the claims related to the Plan. See Hansen, 940 F.2d at 971 ("If. . . the policy at issue here was not an ERISA plan, then the federal courts have no jurisdiction of the case; it should not have been removed from the. . . [state] court where it was filed, and the. . . case [should be] remanded to that state court."). Accordingly, this case is REMANDED to the Fourth District Judicial Court, State of Louisiana, Parish of Ouachita.

### D. Supplemental Jurisdiction

To the extent that Davis has properly asserted state law claims, the Court declines to exercise supplemental jurisdiction. See 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction. . . if the district court has dismissed all claims over which it

---

[14] Because the Court has ruled that the Plan falls within the safe-harbor provision, the Court need not address the remaining elements of the Meredith test. See Meredith, 980 F.2d at 355.

15

has original jurisdiction."); see also McClelland v. Gronwaldt, 155 F.3d 507, 519 (5th Cir. 1998), overruled on other grounds by, Aran v. Ochsner Health Plan, 338 F.3d 433 (5th Cir. 2003) (dismissal of ERISA claims provides "a powerful reason to choose not to continue to exercise jurisdiction").

### E.    Cross-Motions for Summary Judgment

The Court's jurisdiction over the claims raised in the cross-motions for summary judgment are dependent on whether the Plan is subject to ERISA.[15]  Because the Court has found that ERISA-based jurisdiction is absent, the pending cross-motions for summary judgment are DENIED AS MOOT.

### III.   CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [Doc. No. 89] filed by Third-Party Plaintiffs United Steelworkers of America, Local 13-064, and Stanley Green as to whether Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq., applies is GRANTED.  This case is REMANDED to the Fourth Judicial District Court, State of Louisiana, Parish of Ouachita.  The cross-motions for summary judgment filed by Third-Party Defendants P&S Benefit Consultants, Inc. [Doc. No. 78] and The Guardian Life Insurance Company of America [Doc. No. 79] are DENIED AS MOOT.

---

[15]Third-Party Plaintiffs assert that Davis' ERISA claims are time-barred by Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b) ("NLRA").  See [Doc. Nos. 49, ¶ 27; 89-3, pp. 25-26].  Because Davis' ERISA-based claims fail as a matter of law, the Court need not reach this issue.  To the extent that this defense can be raised on remand, the Court notes that state courts have concurrent jurisdiction to hear claims under the NLRA and the Labor Management Relations Act, 29 U.S.C. § 185(a).  See 29 U.S.C. § 185(a).

MONROE, LOUISIANA, this 30th day of August, 2007.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE